May it please the Court, John Erdle for appellants, and I will reserve the balance of the brief period of time that I take for Ms. Spirtos to address the Court. I'll start from the beginning in this case. There are a variety of factors here which justify that the Court should reverse the decision of the district court. The first one is that with respect to the Berger-Kahn defendants, there was a change in the law in the decision of the case Schaefer v. Berger-Kahn. In terms of what Judge Klausner did in dismissing them as sham defendants, we then later in the course of the case filed a motion to amend the complaint to name them and others, which was denied for reasons I'll get to. But what we're saying is that jurisdictionally that the Berger-Kahn defendants should have been, should have remained in the case, and then the Court therefore should have remanded the case back to State court as a result not only of the applicability of the consumer statutes with respect to Berger-Kahn but with respect to the bad faith claim as well and the claims of misrepresentation by Berger-Kahn. The district court indicated that the Berger-Kahn defendants would be dismissed and that it would retain jurisdiction through diversity. We can see now from the change in the law that the case shouldn't have remained in the district court but should have been sent back to the State court at the time when the original action took place prior to the issuance of the Schaeffer v. Berger-Kahn decision. The law even at that time would have allowed us to file a prefiling request petition in the nature of a petition, and the Court could have allowed us to do that in order to maintain the Berger-Kahn defendants and therefore to deny jurisdiction to the Court through diversity and send it to State  court. The Court did not do that. The Court also made a couple mistakes involving some fundamental issues, the first of which is the discovery cutoff date was unilaterally changed in the case. Well, it looks as though it was a mistake and the mistake was corrected. The Court unilaterally changed the discovery cutoff from a time in May to a time in February. March, I think. Excuse me. March. And the Court did that at a time in February when you wouldn't have had sufficient time to propound discovery based on our strategy in order to obtain the responses and then act on them with respect to maybe additional discovery or the filing of dispositive motions. So under those circumstances, that was a highly prejudicial act by the Court, which completely affected the plaintiff in a way that it didn't affect the defendants. And the effect on the plaintiff's strategy is something that has to be considered by the Court with respect to that kind of a unilateral change. We then made a request to change the scheduling order, which the Court, for whatever reason, denied. We believe that both the denial of the request for the scheduling order and the fact that there was a unilateral change in the time for discovery was something that was so prejudicial that that in and of itself would justify the Court's reversal. This case was dismissed on a motion for summary judgment brought by Allstate. First, under the Consumer Legal Remedies Act, they're not allowed to bring a motion for summary judgment in a case that's initiated as a class action. They brought that motion. How could this possibly be a class action? I'll explain. It would be a class action and should be a class action because what's really going on here is a manipulation of the claims practices. And in this case, you can see in particular why it is a manipulation of the claims practices. What Allstate does is they drag out the claims process as long as possible. And they do that in order to get to the point of the one-year period for filing the lawsuit. Then what they do is they use the claims process to affect the litigation process, hoping that there will be that they can use those two back and forth, one to affect the other, as they've done in this case. In this case, there was never even the mold remediation, which required the gutting of the kitchen, the demolition of the kitchen. Now, let me ask you a little bit more about the procedure on the class action. Did you ever move to certify the class? We did move to certify the class. What happened to that motion? And Judge Klausner kicked the motion back and said that he sent the motion back, indicating that it exceeded the page number, even though we had requested leave to file a motion. Did you then remake the motion complying with the page number requirement? We remade several motions. And what happened? And he did the same in each one of those cases. He did the same thing. You were always over the page. Let me say that. He said that either the motion was filed a day late because it was rejected by the clerk at the window, there was a blue paper issued, and then we moved to correct that. And he denied our allowance of making remedial measures so that the motions could be filed. So he never considered the issue of class certification with respect to the motion that we filed. It was kicked back on technical grounds, as well as our motion to stay the case pending appraisal. If you have a bad case on the merits, and I'm asking you to concede that for purposes of my question, if you have a bad case on the merits, are you a good class representative? In Vasquez, the court said you could be. The California Supreme Court indicated that you could actually settle your case under the Consumer Legal Remedies Act and still act as the class representative. Yeah, but that's not my question. If your question is, is there commonality and is there typicality and the basis for class certification, and is there an adequate class representative that you could be? That issue, those issues were never reached by the court. What I'm asking is, were they implicitly reached by the court when the court denied your claim on the merits? That is to say, if the court has denied your claim on the merits, does that necessarily mean that you would not have been an adequate representative of the class? I don't believe that the court ever reached any of the issues as to on the merits for class representation. In that case, myself and Michelle Spiritos were just out of the case. Well, the reason I'm after this is the reason I've gone off on this line of questioning is you're saying that he should not have entered the motion for a summary judgment at all because you would ask somehow for class certification. Then I say, well, what motions had you made? Apparently, they'd all been tossed out on technical grounds. Did you appeal those technical grounds as part of this appeal? Let me explain. I can explain that to you. The statute, the Consumer Legal Remedies Act, states that any case that's initiated as a class action, it doesn't say that your case has to be certified as a class action. The statute itself only reads that the case, any case that is initiated as a class action, is not subject to a motion. Are you reading then that statute to say, and this is not quite your case, you initiate it as a class action. Class action certification is denied. And you're saying even then it's not subject to summary judgment? According to the statute, it wouldn't be. But let's recognize that this is a California procedural statute. Is that controlling in Federal court? Yes, it is controlling in Federal court. And that is an issue that I need to discuss in depth with respect to certain cases which have come out. I must say, this is quite startling to me as a reading of the statute. And quite startling to me that even if that were the meaning of the statute in California, that would be controlling on a Federal court, depriving of its power under Rule 56 to enter summary judgment. It would be. Here's why. There's a case called Batzell. Let me ask you this. For what reason did you file this as a class action? I filed it as a class action because of the misery that we've gone through with respect to it. So you figured if they made your life miserable, you'd make their life miserable? Well, not exactly. But at the time, there were. Maybe because it was a class action that maybe, you know, that they'd leverage on a settlement. No. At the time, there were a number of things going on. For instance, there were fires that had hit California and had wiped out people's houses so that they couldn't do an inventory. And companies like Allstate were saying, we're not even going to address your claims issues unless you can provide us with an inventory. And so we had a wide class of people who were being affected by these same illegal claims procedures. And under the circumstances, I could see certain things as an attorney that related to the claims practices, the relationship between that and the law. But you were, I mean, you were an attorney, but you had a big interest, personal interest in this case, right? Not after the beginning of the case. I was kicked out of it by the judge. We were told that we had no standing as plaintiffs, even though we were covered in shorts under the policy. So I could not have been a class representative to address your question of adequacy. But I mean, if you're after Allstate because you didn't get your claims taken care of the way you thought they should have been taken care of, why would you bring in all these other people? You're just complicating your own claim. Well, I suppose the Court can argue that it's, I mean, you may be able to. I'm just answering you as a practical matter. As a practical matter, my position in the case was that I believe these things were so bad. I had driven at one point from Utah for about 20 hours all the way back and had to clean a house for about 48 hours after that. And then there was a cleaning team brought in by Allstate that was so incompetent that they used toilet brushes to try to scrub down the walls, to clean the walls. There were so many things that were done. They were not providing even a... Okay, but that was your claim. Right. And I could see that this was happening all over the place. You're just going to be the savior of the world, huh, with fires. All right. I mean, I suppose I brought this case, Your Honor, because I believe in the case, as I continue to believe in the case and the actions of Allstate. I believe that Allstate has engaged in practices that are out of a playbook that is common and typical for every person that is involved with them or is unfortunate enough to be involved with Allstate. And at the time, something else was happening as well. There was a pack out of everything in the house. My personal materials, files and so forth, and other goods were taken out and put in these storage containers with American Technologies, a company that they chose, one of their contractors with a project they call Project Time and Cost. And under those circumstances, I wasn't even able to access my own files, let alone personal materials. But when it came time for appraisal, Allstate was able to find its way into American Technologies without any notice to us whatsoever. And they took out all the materials, all the stuff, 500 boxes of goods and materials and documents and records, photographed them, inspected them, and had their appraisers look at them, when logistically it wouldn't be possible or it wouldn't make any financial sense for us to be able to do that. These things were hidden so deeply inside the storage containers that it would take a number of people to remove them from the storage containers just to be able to access them, let alone make them available for photography and appraisal, which they did. We were given no notice of that whatsoever. So every step to it was the same. Kennedy. So you didn't like them. You didn't like the way you were treated. Why don't we have another counsel? Okay. That's fine. I will yield to. You don't mind. Not at all. Okay. Thank you. May it please the Court. I'm Alan Michael with the Berger-Kahn Law Firm. Because of the procedural nature, I spoke with counsel for Allstate and suggested that I come up first and talk about the Berger-Kahn issue. And I usually try to say it's already in my brief. What can I bring here that's new? And the first thing I found was that Mr. Earley, prior counsel, said there was a change in the law when the Schaefer case came down. But then I heard him say a few moments later that all along, he could have done a prefiling petition. He didn't say, but I assume he means under Civil Code Section 1714.10. So I'm not sure exactly what the position is. We've made it very clear, and I think it is clear, that under the Schaefer case the allegation was misrepresentation as to a past fact. It was alleged that my partner in some case had failed to state or had inaccurately stated, allegedly with bad intent, that coverage was a certain, that a certain fact had occurred, a certain position had been taken by a carrier when, in fact, according to the allegations, the carrier had taken a different position. This case is so far from that. The allegation really is that Melody Mosley, my partner, working with Allstate on a coverage matter, was attempting to coordinate on the claims. And because of all of the discontent that the Spiritos family has with the way Allstate handled the claim, and the point person becomes Melody Mosley and Berger-Kahn. And this idea that Schaefer changed the law is just wrong. This case is very much like the original Gruenberg case where somebody tried to sue the lawyers who had helped the insurance company make the coverage decision. And it's been so clear for so long that the agent immunity rule insulates the agent. Somebody who works for an insurance company, any company, any person, has to be able to say, I think you can do this without having the fear of being sued. The other thing that I would bring here today that's new is I was looking at the prior Spiritos case, didn't realize it, but apparently the lawyer who was up there is a member of a firm who, like my firm, has been sued by the Spiritoses for RICO and conspiracy with their client. Their client was the trustee in bankruptcy, I take it. I know nothing about the case but what I heard in court here. And here we are. And apparently there is an M.O. Name the lawyer. Create a problem. Broaden the scope of the dispute from the focus to the general. And that's why Civil Code Section 1714.10 was passed by the California legislature. And although Judge Klostner in his footnote in which he made some comment about the applicability of that seemed to think it didn't matter. He just broadly based his ruling on the dismissing Berger-Kahn on the agent immunity rule. We have brought the motion timely. The State Court Judge Anthony Moore before removal had put that out to be dealt with later and it has never been complied with. And that law requires a factual showing, not just a pleading, a factual showing of the kinds of concerted action that would differentiate the agent immunity rule. And no such factual showing was ever made. And on those grounds, Judge Klostner was well within his rights to say, one, you didn't respond to the demer in time in the State Court. Two, you haven't filed a petition. The fraud claim doesn't cure it. If you look at the Evans v. Pillsbury, Madison and Sutro case, the law in California is that if any of the claims in a lawsuit, whether it's multiple parties or multiple causes of action, if any of them are subject to the conspiracy claim where you have to show factually that there is some basis to your claim of conspiracy, then and no pre-petition has been sought, then the entire lawsuit has got to be tossed. Roberts. What kinds of intentional torts against lawyers would be permitted under California law? Intentional torts, well, by a client, no, by an adversary. Well, obviously, they have malicious prosecution cases. There's an intentional tort against the lawyer for the adversary. I guess you could allege that my lawyer and my adversary and my adversary's lawyer conspired to maliciously prosecute me. But those causes of action are not covered by 1714.10. There's the actual fraud claim. But RICO cases would? In all cases, or does it depend? Well, I think the only exception I know is actual fraud. Or self-dealing. The Pillsbury, Madison and Sutro case you found where a limited partner was taking money, working with the he was actually the limited partner, and so there was the limited financial gain. But the only exception in the statute is actual fraud. Malicious prosecution doesn't apply. And I suppose there's a whole host of intentional torts. But you're talking about conspiracy to commit an intentional tort. And I, you know, what, libel? I think exactly that kind of action is exactly why the legislature stepped in and said, hey, wait a minute. Before you drag somebody's lawyer into every piece of litigation you have with that person or their entity, except for cases of actual fraud or except for cases where you can show that that lawyer outside of getting fees is putting money in his pocket and he's acting out of financial gain. In other words, in those cases where lawyers are doing what lawyers do, advising a newspaper whether it's okay to print this article. Advise somebody that it's okay to breach this contract. The things that lawyers do. You better come up with something that's factual that a judge can look at and say, you know, this goes beyond the line. I see that you have something here. This isn't just a mere allegation. I'm going to let this case go forward. And the rule is that if it's true as to one cause of action but not as to all the other causes of action, you've got to start over. So that's the protocol that's supposed to have been followed. It's a good gatekeeping function, that's what the evidence court calls it, a gatekeeping function to prevent somebody from dragging the lawyer in and then creating, whether it be a conflict of interest situation where the lawyer has to move out, or in any event, broadening the dispute from the main party, in this case the insurance company, to the insurance company's lawyers, and then on and on. If taking all that is true, the test that we're asked to apply here is the removal test, and not only to say that it looks as though the claim against the lawyer is a loser, but it's a sham. How do you satisfy the sham defendant test? Because that's the test you've got to satisfy in order to make this non – make these joined defendants unavailable on the diversity argument. I don't think there's a – under the law, as I understand it, as mentioned in our brief, that it doesn't have to be a bad intent by the plaintiff. The mere absence of a cause of action as pleaded has been found to be sufficient to meet that test. And I don't have the case cited, but it is in our brief. So the sham, the word is sort of pejorative, and it implies that you're trying to be sneaky. What sham means is that the case against this defendant is essentially frivolous. Well, can't it really just mean that on the – on the pleadings, and I think it does mean on the pleadings, on the facts alleged, there is no cause of action stated? And that's exactly the point. It was – it was clear in the very first pleading. There's no cause of action even plausibly stated. Right. Given, for example, an admission. There was an admission in the pleading that Melody Mosley and Berger-Kahn were retained by all State. Bingo. There's the admission that kills any possible claim other than actual fraud. Then you look throughout that complaint and say, where is their actual fraud of the nature that was alleged, and by the way, never proven, in Schaeffer? In that case, it was a past fact. Did the insurance company take a position with an insured? And somebody allegedly said, no, a different position was taken. It was black and white. Not is this law firm working on behalf of an insurance company, assisting the insurance company in a way that the claimant or the insured now differs with? So I think it's such a different thing. We're not saying that they were conniving to do it. They filed in State court. But I think that they want to name people outside their specific target. They did the same thing in the case immediately before ours, but that doesn't make it right, and it doesn't excuse them from the pre-filing requirement. There are so many different ways in which, if Judge Klostner is ruling, you get to the same result, I think it should be affirmed. Thank you. Go ahead. Good morning, Your Honors. May it please the Court. My name is James Fitzgerald with the firm of Strzok & Strzok & Levin. I'm here on behalf of Allstate Insurance Company. This case really asked this Court to focus on scheduling and matters that were brought before Judge Klostner as the district court judge, and whether or not Judge Klostner abused his discretion. In many instances, they raised essentially just about every motion that was brought. Now, I'd like to respond to Judge Fletcher's comment about the discovery cutoff. There was a clerical error. It appears, in fact, at page of the record, the appellant's record, page 694. This is the printout by the PACER computer system, which is basically the online system which will indicate what the, what was happening in the court. And it lists, after the scheduling conference in November of 2003, it lists the schedule from now to trial. When one looks at it, anyone who's a practitioner knows that there must be some error, because the discovery cutoff, for example, is set for, according to this, May 14th. Yet the motion cutoff, this positive motion cutoff, is set for two and a half months before that, March 31st. Now, everyone knew, parties knew, that Allstate, and it was in our papers, had intended to file, at the least, a summary judgment motion after discovery was over, and the deadline, therefore, for that was going to be March 31st. Therefore, when Mr. Eardley made a comment about his strategy, I'm not sure what that strategy would be, because obviously, if the motion for summary judgment, and that was the last day that it could be brought, the clear implication in every district court I've been before is that, therefore, if that's the last day for motion cutoff, you should have all your discovery completed. Now, it's important to bear in mind, this case was filed in August of 2002. Now, there is also, and I think Mr. Eardley puts it in the record, there's a transcript of a proceeding when that case was started in State court, before Allstate was served, and the Court addressed, Judge Tony Moore addressed the issue of the class action. And, in fact, Ms. Spertos was there as well as Mr. Eardley. And one of the things that Judge Moore brought up with Mr. Eardley, something to respond to a question that was raised before, I think, by Judge Prakerson, is, was Mr. Eardley, Ms. Spertos, the proper class representative? And, in fact, Judge Moore said, you have a grave concern here because you, in fact, are a plaintiff. You have a conflict of interest. You couldn't be a class representative anyway. That was one of the defects. That was known by them early on, yet they persisted in it. But as well, the judge said at that time, I see a real problem with this as a class action, even to proceed as a class action. While Ms. Spertos, Thelma Spertos, clearly had a dispute with Allstate about her insurance claim, it was a unique dispute limited to her facts. Every Allstate insured, every State farm insured, 20th Century insured, any insured over a fire, those are unique issues with regard to what damage there is, how much it should be valued at, whether there should be additional living expenses, how much the contents are valued at. Those were all particular to those. It is not the proper subject of a class action, at least the class action allegations that they initially alleged in their complaint. Judge Klobuchar saw that as well. The problem that we have here, we believe, is that every step along the way, and to answer, I think it was Judge Fletcher who asked, did you ever re-file the class certification motion, the answer was no. They filed other motions, they did not go back and file a motion again and correct the deficiencies that the clerk had noted and ask the Court, please, we made a mistake, we'd like to file a class cert. And without that class cert motion, it was entirely improper for us to bring a motion for summary judgment as to the class action allegations. And that was what was done, and Judge Klausner recognized that as well. In essence, Your Honors, there is nothing here that would show that Judge Klausner abused his discretion. Now, on the summary judgment motion that was filed, Mr. Erdly and Fertos claimed that they needed more time, and they bring a rule, they argue Rule 56-F. But remember when this case was filed, it was filed in August of 2002. The motion to dismiss was resolved by the winter of 2003. Discovery cutoff wasn't until March 31 of 2004. There was a year to do discovery. They chose not to do any. In fact, they chose not to do any until we had filed our motion for summary judgment and the discovery cutoff had already hit. If that was their strategy, well, then respectfully, that was a misguided strategy. But the Court made it very clear at scheduling conferences, these are deadlines. These will be the deadlines that will be imposed. These are to be followed. Unfortunately, we have a pattern here of counsel not following those rules and not following the local rules as well. And even when the Court told them we're striking this, we're rejecting it, they'd still come back and do the same thing again on the next motion. They did not pay any attention to the Court's rules. And ultimately, the Court even entertained the motion for reconsideration after the Court had ruled on the summary judgment and said even giving the benefit of the doubt, I still, Judge Klausner says, my motion still stands on merits and my decision stands. And, Your Honors, we believe that this ruling and the judgment of the court below should stand as well. I'd be happy to answer any questions at the trial house. Thank you. Thank you, Your Honor. I need to give you a context of this case. While we're dealing with the trustee, the house burns down. And the house burns down. We are in Utah. We have to drive back to Utah to deal with this catastrophe. It is interesting that Appellee's counsel indicated they had no idea that the litigious, vexatious litigants that we are had been filing a similar case with the trustee when I, in fact, think there's a direct correlation. Because as I stated earlier, it is more than a coincidence that only until we had the all-state fire that we had a change of guards with the trustee and all of a sudden a case that doesn't want to be dismissed and a trustee who is suing in contravention of the plan trying to get a hold of the very house that is the subject of the all-state litigation. So are you alleging that there's a conspiracy between all-state and the prior suit? I'm alleging that if we did discovery, there could very well be so. I think that the ---- Have you done any discovery? Yes, we did actually. We did actually propound discovery. What discovery did you do? We propounded discovery, I'm trying to remember, with the first case, because this case has been refiled in State court. I'm asking about the case as it was filed in Federal district court. Did you do any discovery in Federal district court? We did do discovery. We did do discovery. What discovery did you do? I think we propounded written requests, requests for admissions, everything. But the problem was that ---- What do you mean by everything? Everything we could do, save for depositions. Why didn't you do any depositions? I think it was a matter of simply cost. You have to recognize that, you know, the only reason we filed the lawsuit is because the policy itself requires you to file within one year. We were getting close to the one-year deadline, and we weren't getting anywhere with the California Department of Insurance. So, you know, we're trying to do the best we are doing. So in fact, according to what you're now telling me, you'd asked for admissions? Yes. And you'd filed written interrogatories? Yes. And we also asked for telephone records, production of documents. And when had you done that? I don't have the dates in front of me, but when we ---- what I believe happened was when we propounded discovery, and we had this change of discovery dates, we were told then that the discovery was too late, and they never responded to the discovery because of the discovery cutoff. When did you ---- I guess I should ask you this then. When did you ask for these admissions, and when did you file your request? I don't have it in front of me. I don't have it in front of me because I was actually pregnant at the time, but I was a little bit out of it. But I believe that we did it very close to the date, probably very close to the date that we originally thought the cutoff was, which I think was May, so maybe sometime in March or late February. Not as early as Allstate, clearly. So you let it sit for a year, and you just told me you never did intend to take depositions? No, no, no. We didn't let it sit for a year because the case was filed in August. August of 2001. August of 2002. Yes. And then we started doing discovery, I believe, in about seven months later, February, maybe March. But the discovery cutoff is in 2004. Was it 2004? Let me remember. August 2002. Well, it might have been a year, but you have to ---- I don't have the dates in front of me. I'm trying to ---- We're in a burned house trying to ---- No, you're not. You're out of the burned house. No, we're not. We're in the burned house. Oh, that's right. So you moved back in. We moved back in because they never moved us out of the burned house to a suitable house. Well, they moved you out of a house that you didn't like. No. They moved us out of a house that no one could move to. I had a grandmother who can't fly the stairs and a 75-year-old mother who doesn't want to live in a house with no ---- Security system. Security system. So I had a problem here because I am the one having to take care of two elderly people driving back and forth, and it was virtually impossible. But the thing ---- And their obligation, as I understand it, is to provide you with a house that is of equivalent value. Well, that's the issue. When you asked about why it was a case filed as a class action, well, first of all, we were dealing with other attorneys behind the scenes. We certainly did not intend to be class counsel. We had big guns behind us who thought that it was a good class action and that if it came to that situation, those big guns ---- And why didn't those big guns show up and then file a proper class certification motion? Well, once the kids started going downhill, they didn't come out. But what I wanted to address was the reason that we filed it as a class action was because of the difference between what the policy provides and what we got. For example, the policy has a maintain your standard of living, additional living space. And you thought a $25,000-a-month house was okay? My mother ---- We have a four-acre house with six bedrooms, a guest house. How ---- In order for you to move that entire ---- Now, was the guest house burned also? No, no, no. The guest house is where my grandmother was living. So everyone was living in the guest house. Although $25,000 sounds excessive, the problem is, is that there's no rental houses in L.A. County. We searched everywhere. In fact, all State couldn't find a rental house. They found one rental house, and they didn't even find it. It was actually my mother's friend, Gloria Breitman, who was a realtor, who lent it to us because it was on the market. It was not for rent. So we were only there as long as it was available, which was two and a half months. And then she sold it. So they did not find that house, and we didn't like it and moved out. They never found us a house. Okay. So what had happened was, as soon as the house burned, instead of finding this alternative living situation, we're living literally in a burned house, and their ---- Was it their obligation to find the house or simply to pay you some money? No, their obligation is to help you look for a house and pay the money for it. I mean, you have to recognize that, you know, this is a ---- I mean, fires are a traumatic experience for people. To come into a house where my ---- sitting here on top of all this trustee stuff going on, and walk into this house, I can't even express to you, burned ---- excuse me. The fire was raging for nine hours because the insurance ---- because the alarm system didn't go off. So this house was not a little fire. This was a massive fire. And they didn't find us a house or even help us find a house, I think, for three months. And like I said, the person who found us a house was actually my mother's friend. I heard you. Yeah. So when they tried to make it out to ---- it was $25,000 a month. Well, the problem is L.A. doesn't have a very great rental market. So we look for houses in Pasadena. We look for houses everywhere. But that ---- to get a house that's comparable to the policy, which is maintain your standard of living, so that everyone can move to the house so I can take care of my older grandmother and my mother, that's what it would cost. And if you buy a new policy now, as we have, the additional living expenses are routinely about 20, 30 percent of the policy. They paid less than $60,000 eventually. And then they moved us into a house with no furniture after four months. So, you know, that's a big issue, fair rental value versus additional living expenses. That was one issue on appeal. There were a lot of issues that were contained in the insurance deluxe homeowners policy that we believed were common and typical of the class because they provided or advertised one standard of accommodation and in practice you get another. Again, this is all going on simultaneously with our problems with the trustees. So perhaps you were a little over excessive. Perhaps you were unhappy. I don't know how to explain to you what it's like to live in a burnt house and have to deal with all this stuff going on. You either, you know, give in the towel and bury your head and go commit suicide or you deal with what you're doing. And that was what we tried to do. I think the class was a good class because I think what they did with us is what they do with everyone. And I think that they have a litigation history that we talked about in our briefs. Every case is removed to Federal court. Everyone is a sham defendant. They have a history, you know, Diaz versus Allstate. They have several published opinions where, you know, this is their tactic. And they use attorneys as claims adjusters even though California law does not allow them to do so. So you're basically stuck with an adversarial position where you're trying to get the simplest claim paid for. And instead of just paying for the claim or just paying for additional living expenses, you're litigating. And that's what we were dealing with simultaneously with the trustee. So I'll go ahead and let appellees discuss the issue. Was the cause of the fire ever determined? I'm sorry. What caused the fire? Oh, what caused the fire actually was electrical shortage. But the fire, what the experts determined, would have been out in a few hours. But unfortunately, we had ADT security, and they determined, Allstate's experts determined, that ADT negligently shut off the entire alarm and fire system. So apparently the fire went on for nine hours undetected by the Whittier Fire Department. So that is, in fact, we had to segregate our claim against ADT to Allstate, because they did end up suing ADT, and I don't know if they settled or not. But that was the cause of the fire. And the problem was, is that it broke all these pipes and water shot everywhere. Pipes that they didn't detect or, I mean, they detected the pipes, but they didn't rectify the leaking water for about three months, which led to the toxic mold, which after the house was, the kitchen almost done, then they recognized that there was toxic mold and paid it all the way up until, I don't think they paid the mold until late 2004, causing the whole kitchen to have to be re-demolished, gutted, because that's what they have to do with mold remediation. So that was the cause of the fire. Oh, go ahead. Well, what did you say? I said that the remaining time I'll reserve for rebuttal. You're over your time, and your rebuttal's been had. You're all done, see. You're all done. I guess we're all done. All right. Thank you.
judges: Pregerson, W. Fletcher, Bybee